## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LISA M. BLACKERT,
    Plaintiff,

    v.

NANCY E. BERRYHILL, ACTING
COMMISSIONER OF SOCIAL
SECURITY, U.S.A.,
    Defendant.

CIVIL ACTION NO.
3:16-CV-1327 (JCH)



JULY 25, 2017

**RULING RE: MOTION FOR JUDGMENT ON THE PLEADINGS (DOC. NO. 23) &
MOTION TO REVERSE THE COMMISSIONER'S DECISION (DOC. NO. 19)**

## I.    INTRODUCTION

Plaintiff Lisa M. Blackert ("Blackert") brings this action under title 42 section 405(g) of the United States Code, appealing from the final determination of the Commissioner of Social Security ("the Commissioner"), denying her disability insurance benefits and supplemental security income.  Motion to Reverse the Decision of Commissioner ("Pl.'s Mot.") (Doc. No. 19).  The Commissioner cross-moves for an order affirming that decision.  Defendant's Motion for Judgment on the Pleadings ("Def.'s Mot.") (Doc. No. 23).

For the reasons set forth below, the Motion to Reverse the Decision of the Commissioner is **GRANTED**, and the Motion for Judgment on the Pleadings (Doc. No. 23) is **DENIED**.  The case is remanded to the ALJ for proceedings consistent with this decision.

## II.    BACKGROUND

A.    <u>Facts</u>

1

Lisa M. Blackert was born in 1958, and was 52 years and 9 months old at the age of her alleged onset date of March 21, 2011.  Plaintiff's Statement of Facts (Doc. No. 19-1) at 2.  She is a licensed practical nurse, but has not worked since March of 2011, with the brief exception of a nursing position she held in 2013, from which she was terminated two weeks into a three week orientation program because she "wasn't catching on fast enough and [she] was too slow."  Certified Transcript of Record ("R.") at 129.

The medical record begins in February of 2011.  On February 8, 2011, Blackert was seen by David Bounds, APRN, and Dr. Mark Thimineur for "chronic migraines, knee, multifocal pain."  R. at 396.  Treatment notes from that visit reflect that Blackert's "pain medications are helping to some extent, but she is still having more headaches than she would like."  Id.  She was diagnosed with "Chronic headache pain secondary to migraines, neuralgias."  R. at 397.

Blackert was seen by Dr. Thimineur again on April 19, 2011, for bilateral "knee pain due to ACL repair and chronic migraine headaches."  R. at 399.  Dr. Thimineur noted that Blackert was taking Relpax and Topamax for her headaches, both of which "help her," and was also taking Percocet for her knee pain.  Id.

Blackert saw Courtney Howard, Certified Physician's Assistant, for July 25, 2011, for hypertension, migraine headaches, and depression.  Howard's notes reflect that Blackert's headaches were "controlled with pm Relpax" and that she was "doing ok on Effexor 75mg" with respect to her depression.

On October 27, 2011, Blackert saw Heather Alfonso, Advanced Practice Registered Nurse, for pain resulting from migraine headache and headache.  R. at 403–

04.  Blackert's headaches were described as having an "aching and crushing" quality, with associated symptoms of "swelling, photosensitivity, nausea and vomiting during headache."  R. at 403.  Treatment notes reflect that Blackert's headaches are alleviated by "medication, rest and dark room" and exacerbated by "bright lights, loud noise, chewing and stress."  Id.  The severity of Blackert's headaches was characterized as "2" and the narrative section notes that Blackert was "[d]oing well with current medication regime."  Id.  Results of physical and neurological exams were all in the normal range.

On January 27, 2012, Alfonso saw Blackert again and noted that her "[p]ain levels, functionality have remained stable without any major changes since the last visit."  R. at 406.

On April 17, 2012, Alfonso saw Blackert again.  R. at 409.  Alfonso's treatment notes reflect that Blackert's younger sister died of a heart attack since her last visit, and that she was very upset as a result.  Id.  Alfonso states that Blackert "has a hard time even getting out of her house to run errands."  Id.

On July 18, 2012, Alfonso saw Blackert again.  Alfonso's notes state that "Patient reports >50% relief of pain, improvement in participation in activities of daily living on current medication regimen, Patient does not report any side effects or adverse reactions from prescribed opioid medications and No aberrant behaviors related to prescribed opioids identified during this visit."  R. at 414.

On January 15, 2013 Alfonso saw Blackert again, and noted that Blackert "will potentially be starting a new position in assistive living."  R. at 418.  Alfonso further notes that Blackert's "pain levels are stable" and that her pain is "manageable."  R. at 419.

On April 10, 2013, Alfonso saw Blackert again.  Alfonso states that Blackert's "pain levels have been stable with Percocet," and that Cymbalta (an antidepressant) has been "helping significantly."  R. at 421.

On July 10, 2013, Alfonso saw Blackert again, and noted that Blackert reported both that her "current pain medication regimen are 'helping tremendously'" and that Blackert "noticed an increase in her migraines (15 or more episodes) with nausea over the past 2 months."  R. at 425.  In this visit, Alfonso and Blackert discussed the possibility of Botox injections for her migraines, and Blackert "verbalize[d] interest" in that treatment.  Id.  Alfonso's notes describe Blackert's migraines as occurring "on greater than 15 days per month for at least 3 months" with "at least five full filling [sic] criteria for migraine without aura, headaches on average last more than 4 hours."  Id.  Alfonso describes the pain as "moderate or severe in intensity" with "nausea and/or vomiting, photophobia and phonophobia."  R. at 426.  Alfonso further notes that Blackert "complains of pain and muscle tenderness of her neck and shoulders."  Id.  During this visit, Alfonso describes administration of "Spinal accessory nerve block" and "Occipital nerve block" for "pain relief" and "Trigger point injection" for "pain control."  R. at 426.

On August 20, 2013, Blackert saw APRN Patricia Blanc at Cornell Scott Hill Health Center.  During that visit, Blackert reported "sparks out of peripheral of right eye x weeks" and "Constant migraine headaches x 30 years."  R. at 385.  Blanc's notes reflect that Blackert was aware of a CT scan "about four years ago with shows ?? lesion on the brain but nothing was done about it.  Neurologist who saw her is now in prison."  Id.  She also states that Blackert's pain in her neck was greater than her shoulder pain, and rated that pain at 6/10.  Id.  Testing was ordered, including an MRI.  Id.

On October 8, 2013 Alfonso saw Blackert again.  Blackert reported that her pain levels were "somewhat exacerbated with the barometric pressure changes and recent sinusitis."  R. at 429.

Blanc saw Blackert again on October 10, 2013.  She noted that Blackert was experiencing pain in her right knee.  R. at 374.

Dr. Thimineur saw Blackert on November 5, 2013.  Spinal accessory nerve blocks and trigger point injections were administered in the cervical/shoulder areas.  R. at 434.

Dr. Hong Lin saw Blackert on January 3, 2014, for medication management related to her complaints of depression and anxiety.  He adjusted her dose of Cymbalta downward, and also prescribed Ativan and Ambien.  R. at 485.

Alfonso saw Blackert again on January 7, 2014.  Blackert reported that an MRI had been conducted, and showed new lesions, but was still awaiting "results."  R. at 437.

Dr. Hong Lin saw Blackert again on February 7, 2014.  He notes at that time that Blackert "is coming to terms with her recent diagnosis of MS."  R. at 484.

Alfonso saw Blackert again on March 4, 2014.  She notes that Blackert "has Multiple Sclerosis which she was unaware of" and recommends following up with a neurologist.  R. at 441.

Dr. Hong Lin saw Blackert again on March 14, 2014.  His notes state that Blackert had recently visited her father, who was undergoing treatment for brain cancer, in Florida.  R. at 483.  He further noted that Blackert was experiencing "sensory

symptoms 'tingling' of her thigh and fingers" as a result of her MS, as well as "scattered focus and concentration."  R. at 482.

PA-C Courtney Howard was seen for routine follow-up on April 28, 2014.  Her notes include statements that Blackert "relates complaint of tingling in her left thigh and bilateral finger and toe parethesias" as well as "difficulty with her stability with tilting her head back" while showering.  R. at 604.  Howard further notes that Blackert's migraines "remain uncontrolled despite use of topomax, relpax, and pm percocet."  R. at 605.

Blackert saw Susan York, LMFT, for counseling on August 14, 2014.  She notes, among other things, that "this patient is not able to work anymore.  She has attempted several times but her concentration is no longer sharp enough.  The MS is gradually worsening and it can be seen in her sessions with this therapist."  R. at 522.  Notes from York on September 11, 2014, indicate that Blackert is "doing fairly well."  R. at 524.  On September 12, 2014, in "annual review" notes, York states that she "has observed a deterioration in patient's ability to process her thoughts and communicate at a normal speed."  R. at 527.

Blackert saw Ashley Dizney, APRN, on September 16, 2014.  She describes Blackert as having "chronic intractable migraines" and states that she gets "15 Relpax tablets/month, and she takes these when migraines are at the worst."  R. at 572.

On September 19, 2014, Blackert saw Dr. David Pitt, a neurologist, for the first time.  He notes that Blackert reported "moderate pathologic fatigue," and "frequent falls."  R. at 550.  He further noted that she was experiencing headaches about four times per week and appeared "tangential and had difficulties recalling her past medical history."  R. at 550–51.  He noted moderate impairment of her hand coordination.  R. at

551.  Dr. Pitt also noted that Blackert had "several neurological deficits (cognitive, numbness in fingers and feet/lower legs, balance problems)" that have "gradually manifested over the last 1–2 years" with no relapses.  R. at 552.  Based on the absence of relapses as well as Blackert's MRI, Dr. Pitt concluded that "a diagnosis of PP-MS [Primary-Progressive Multiple Sclerosis] is possible."  Id.

York's September 26, 2014 treatment notes state that Blackert "is devastated" by her diagnosis of PP-MS.  R. at 530.

Blackert saw Dr. Pitt again on October 31, 2014.  He referred to her as a "patient with likely MS," and ordered additional testing.  He also referred Ms. Blackert to Dr. Franklin C. Brown, Ph.D., for a neuropsychological examination.  However, Dr. Brown did not complete the examination and concluded that his results were "not valid" because, although Blackert experienced some "cognitive difficulties," she also was "easily overwhelmed" and "emotionally distraught," and the findings were therefore "uninterpretable."  R. at 563.

On March 10, 2015, Blackert saw Alfonso again.  Notes reflect that Blackert was taking Ampira for "brain fog" with "minimal effect noted."  R. at 20.  Alfonso further notes: "Exam today shows changes in neurological findings: abnormal tandem walking and abnormal rapid finger tapping noted."  Id.

On June 9, 2015, Blackert saw Theodora McPherson, PA.  McPherson's notes reflect that Blackert reported that her "current medication regimen reduces her pain by 80%" and that she "is able to do housework and drive."  R. at 25.

On September 10, 2015, Blackert saw Julie Heher, APRN.  She reported migraines "almost every morning and night" since her potassium levels had fallen out of

regulation, but reported a 70% reduction in her pain when she takes replax and

Percocet, which allowed her to "complete her daily activities."  R. at 38.

Between October and December, 2015, Blackert had four more follow up visits,

and reported pain reduction levels of 50%, 70–80%, 40–60%, and 40–70%,

respectively.  R. at 41–52.

B.    Procedural History

Blackert applied for disability benefits and supplemental security income on

March 18, 2014.  Her applications were initially denied in a decision dated May 16,

2014, R. at 202–11, and she filed a request for reconsideration on May 21, 2014, R. at

212–13.  Upon reconsideration, the requested benefits were denied once again on

August 15, 2014.  R. at 218–25.  Blackert then filed a request for a hearing before an

Administrative Law Judge ("ALJ") on August 25, 2014.  R. at 226.  The matter was

assigned to the Office of Disability Adjudication and Review in New Haven, Connecticut,

for hearing, decision, and order.

That hearing took place before ALJ Ronald J. Thomas on May 1, 2015.  See R.

at 123–47.  ALJ Thomas heard Blackert's testimony and also heard testimony from a

vocational expert.  On August 27, 2015 ALJ Thomas denied Blackert's claims in their

entirety.  ALJ Thomas concluded that Blackert had demonstrated that she had two

severe impairments, specifically multiple sclerosis ("MS") and depression, and that she

had not met her burden with regard to any other impairments, including migraine

headaches, neck pain, and back pain.  R. at 80.  ALJ Thomas found that neither

Blackert's MS nor her depression rendered her unable to work.  R. at 83.  He concluded

that Blackert could no longer work as a nurse, but that she was still capable of

performing "medium work" as defined in title 20, section 404.1567(c) and 416.967(c), of

the Code of Federal Regulations, "except that she can perform only occasional bending,

balancing, twisting, squatting, climbing, crawling and kneeling; and she is limited to

simple, repetitious, routine work." Id. A finding that Blackert is capable of performing

medium work entails finding that she can "lift[ ] no more than 50 pounds at a time with

frequent lifting or carrying of objects weighing up to 25 pounds." 20 CFR 404.1567(c).

On October 29, 2015, Blackert filed an appeal of ALJ Thomas's decision. R. at

71–73. That appeal was denied by the Social Security Appeals Council on June 1,

2016. R. at 1–4. The decision of the Appeals Council rendered the denial of Blackert's

claims final and thus appealable to this court.

## III. STANDARD OF REVIEW

Under title 42 section 405(g) of the United States Code, it is not the district

court's function to determine de novo whether the claimant was disabled. See Schaal v.

Apfel, 134 F.3d 496, 501 (2d Cir. 1998). Instead, the court is limited to two lines of

inquiry: whether the ALJ applied the correct legal standard, and whether the record

contains "substantial evidence" to support his decision. See Rosa v. Callahan, 168 F.3d

72, 77 (2d Cir. 1999). "Substantial evidence" requires "more than a mere scintilla of

evidence. It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)

(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

## IV. DISCUSSION

Blackert raises four errors: (1) that the ALJ failed to adequately develop the

administrative record, Pl.'s Mem. at 1, (2) that the ALJ's finding that Blackert's migraines

9

were not a "severe impairment" was harmful error, id. at 9, (3) that the ALJ failed to follow the "treating physicians" rule, id. at 15, and (4) that the ALJ's vocational analysis was defective, id. at 20.  The court addresses each of these arguments in turn.

A.    Adequate Development of the Record

An ALJ in a social security benefits hearing has an affirmative obligation to develop the record adequately.  See Rosa, 168 F.3d at 79.  Although this obligation is heightened where the plaintiff is pro se, see Echevarria v. Secretary of HHS, 685 F.2d 751, 755 (2d Cir. 1982), the "non-adversarial nature" of social security benefits proceedings dictates that the obligation exists "even when . . . the claimant is represented by counsel."  Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must himself affirmatively develop the record' . . . .") (quoting Echevarria, 685 F.2d at 755).

The expert opinions of a treating physician are of particular importance to a disability determination.  See Hallet v. Astrue, No. 3:11-cv-1181, 2012 WL 4371241, at *6 (D. Conn. Sept. 24, 2012) (concluding that "[b]ecause the expert opinions of a treating physician as to the existence of a disability are binding on the factfinder, it is not sufficient for the ALJ simply to secure raw data from the treating physician" and remanding for further development of the record); Ayer v. Astrue, No. 2:11-CV-83, 2012 WL 381784, at *3 (D. Vt. Feb. 6, 2012) (remanding to the ALJ "given the ALJ's failure to request medical opinions from any of Ayer's treating providers . . . which resulted in a substantial gap in the record").

Here, the record contains no expert opinion from a treating physician about Blackert's residual functional capacity ("RFC").  The absence of such evidence was

noted by the state agency medical consultants.  See R. at 154 (report of medical

consultant Joyce Goldsmith); R. at 183 (report of medical consultant Bich Duong); R. at

169 (report of psychological consultant Kelly Rodgers); R. at 186 (report of review

psychologist Katrin Carlson).  ALJ Thomas even commented on the lack of opinion

evidence from a treating physician in his ruling: "Interestingly, her treating neurologist,

Dr. Pitt, is silent on the issue of her ability to work and has not advised her that she

could not or should not work."[1]  Id. at 88.  Despite this recognition, however, there is no

indication that ALJ Thomas attempted to "fill [the] clear gap[ ] in the administrative

record."  Rosa, 168 F.3d at 79.

As the Commissioner accurately notes, the Second Circuit has held that remand

is not appropriate "solely on the ground that the ALJ failed to request medical opinions

in assessing residual functional capacity."  Tankisi v. Comm'r of Soc. Sec., 521 Fed.

App'x 29, 34 (2d Cir. 2013).  However, in so holding the court emphasized the

"voluminous medical record," which included "an assessment of [the claimant's]

limitations from a treating physician."  Id.

The Commissioner argues the record in this case is extensive, and therefore the

opinion of treating physicians is unnecessary.  To support this assertion, the

Commissioner states that "the ALJ relied on the opinions of no less than four state

Agency medical consultants and notes from Plaintiff's neurologist, therapist, primary

care physician, and treatment providers at the Comprehensive Pain and Headache

---

[1] To the extent that this language reflects ALJ Thomas's belief that an absence of treating
physician opinion should be construed against a claimant rather than remedied by the ALJ, that belief is
clearly erroneous.  As the Second Circuit has written, the fact that a claimant submits medical evidence
from treating physicians, but not opinion evidence, does not "excuse" an ALJ's failure to develop the
record, nor does the fact that a claimant is represented by counsel.  Tankisi v. Comm'r of Soc. Sec., 521
Fed. App'x 29, 33 n.1 (2d Cir. 2013).

Treatment Centers," as well as Blackert's "reported activities."  Defendant's

Memorandum in Support of her Motion for Judgment on the Pleadings ("Def.'s Mem.")

(Doc. No. 23-1) at 5.  Blackert argues, on the other hand, that the record lacks any

meaningful assessment of her physical capacity or any other functional limitations

stemming from her MS and migraine headaches.  Plaintiff's Memorandum in Support of

her Motion to Reverse the Decision of the Commissioner ("Pl.'s Mem.") (Doc. No. 19-2)

at 2, 8.

        The court concludes that the record is not sufficiently extensive to negate the

necessity for the opinions of one or more treating physicians.  In particular, the record

lacks substantial evidence that Blackert is capable of medium work.  To conclude that

Blackert is capable of doing medium work, ALJ Thomas must rely on substantial

evidence that she can "lift[ ] no more than 50 pounds at a time with frequent lifting or

carrying of objects weighing up to 25 pounds."  20 CFR 404.1567(c).

        Two of the state medical consultants, Dr. Goldsmith and Dr. Duong, concluded

that Blackert could perform medium work.  See R. at 154 (opinion of Dr. Goldsmith); R.

at 188 (opinion of Dr. Duong).  However, as ALJ Thomas acknowledges, "these

opinions are from non-examining and non-treating expert sources," which militates

against placing great weight on their conclusions.  R. at 89.  The conclusions of Dr.

Goldsmith and Dr. Duong were based on treatment notes from the Chronic Pain and

Headache Treatment Center ("CPHTC"), which repeatedly report that Blackert's

strength, grip, reflexes, and range of motion are in the normal range.  See R. at 403–44

(medical records from CPHTC).  However, this evidence is insufficient to show that

Blackert can perform medium work, for two reasons.

First, it is unreasonable to extrapolate from "normal" evaluation scores that Blackert, a woman in her fifties with MS and joint pain who weighs one hundred pounds, can lift fifty pounds and carry twenty-five pounds.  The word "normal" is too vague to bear the weight that the Agency consultants apparently placed upon it.  See Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) (concluding that the ALJ lacked sufficient evidence where a finding that the plaintiff could perform "light work" was based largely on her physician's vague assessment that she "should be able to lift . . . objects of a mild degree of weight on an intermittent basis"); see also Brady v. Colvin, 14-CV-5773(ADS), 2016 WL 1448644, at *8 (E.D.N.Y. Apr. 12, 2016) ("The use of the terms 'mild,' 'moderate,' and 'marked,' to describe the Plaintiff's restrictions . . . are the kinds of vague terms, which courts have found insufficient to support a determination that a Plaintiff is not disabled under the Act.").  It may be that, had their opinion been elicited, the practitioners who evaluated Blackert's strength would have opined that she was capable of medium work but, in the absence of opinion evidence, the raw data alone does not suffice to satisfy the "substantial evidence" standard.

ALJ Thomas also had the benefit of treatment notes from Dr. David Pitt, who examined Blackert in September of 2014, after Dr. Goldsmith and Dr. Duong reached their conclusions.  Dr. Pitt described Blackert's muscles as "normal with regard to strength, tone and bulk."  R. at 551.  However, like the CPHTC evaluations, describing strength as "normal" is simply too vague to substantiate a finding that occasionally lifting fifty pounds and frequently lifting and carrying twenty-five pounds is within Blackert's capacity.

The second reason that these CPHTC evaluations cannot bear the weight that has been placed on them is that medium work requires both strength and endurance, because medium work may require "frequent lifting or carrying of objects weighing up to 25 pounds." 20 CFR 404.1567(c) (emphasis added). In addition to the inferences that can be drawn from Blackert's age and size, her medical records and her hearing testimony both suggest that frequent lifting and carrying of objects weighing up to twenty-five pounds would be beyond her exertional capacity. For example, during the hearing in front of ALJ Thomas, Blackert testified that the heaviest thing she had lifted "in the last couple of weeks" was a gallon of milk. R. at 136. She testified that she was taking medication for fatigue, and that she "rest[s] all day pretty much": "You know, if I–if I–if I do something like clean out the kitchen sink, I need to rest afterwards." R. at 136. Similarly, in his notes from an examination of Blackert on September 19, 2014, Dr. Pitt states that Blackert reported "moderate pathologic fatigue." R. at 550. His notes from an examination on January 23, 2015, list Blackert's "main problems" as "fatigue, cognition and balance." On January 23, Dr. Pitt prescribed Provigil "for [Blackert's] fatigue" and Dalfampridine "[t]o address the patient's muscle fatigue and to improve her walking." R. at 560.

As the Commissioner points out, ALJ Thomas also considered Blackert's activities in making the RFC finding that he did. Activities that ALJ Thomas notes include a trip to Florida, going out to dinner, going camping with her boyfriend once, exercising, and completing chores. R. at 85–88. However, this evidence is of little probative value without knowing more details about the activities. Did she lift heavy suitcases while traveling, or chop up firewood while camping? Does her nightly

exercise regime involve bench pressing fifty or more pounds?  In sum, while these activities may indicate that Blackert is capable of some degree of physical exertion, they say almost nothing about her capacity to perform medium work.

In light of the foregoing analysis, the court concludes that the record was not sufficiently extensive to compensate for the absence of medical opinion evidence from treating physicians.  Indeed, ALJ Thomas did not have the benefit of opinion evidence from any physician who examined Blackert, much less a treating physician.  See Ayer, 2012 WL 381784, at *6 (remanding for development of the record "[b]ecause the ALJ failed to seek an opinion as to [the plaintiff's] disability from her treating sources before relying on the opinions of non-treating, non-examining sources").  This case is therefore a far cry from the facts in Tankisi, where the absence of medical source statements from treating physicians did not justify remand because the ALJ had the benefit of a "quite extensive" record and "an assessment of Tankisi's limitations from a treating physician," as well as evaluations by two consulting physicians, one of whom conducted "a history of the patient and a full physical examination" and examined Tankisi twice. Tankisi, 521 Fed. App'x at 34.

For these reasons, the court finds that there is not substantial evidence in the record supporting the ALJ's decision that Blackert could perform medium work, including occasionally lifting fifty pounds and frequently lifting or carrying twenty-five pounds.  On remand, the ALJ should seek opinions from the plaintiff's treating physicians, including her neurologist, Dr. Pitt, on this issue.

B.    <u>Finding that Blackert's Migraine Headaches Are not a "Severe Impairment"</u>

In light of the court's conclusion that ALJ Thomas failed to adequately develop the record, the court does not reach the merits of the parties' arguments with regard to ALJ Thomas's finding that Blackert's migraines are not a "severe impairment." However, the court recognizes that the record contains indications that, at least during some periods of time since Blackert's alleged onset date of March 21, 2011, her pain has been adequately managed by medication.  <u>See</u> R. at 414 (treatment notes indicating that Blackert was experiencing "improvement in participation in activities of daily living on current medication regime" in July, 2012); R. at 418 (treatment notes stating Blackert's pain is "manageable"); R. at 425 (treatment notes indicating that Blackert's medication is "helping tremendously" in July, 2013).

Nevertheless, on remand ALJ Thomas should consider revisiting some of his factual findings.  For example, ALJ Thomas observed that Blackert "repeatedly rates her average pain level at '2' on a scale from '0' to '10.'"  R. at 80.  Blackert points out that, in many of the treatment records where a severity of "2" is noted, the notation is not accompanied by any explanation of the scale being used, and that the number "2," without more context, indicates very little about how severe her headaches were.  <u>See</u> Pl.'s Mem. (Doc. No. 19-2) at 14.  On the other hand, both the medical record as a whole, including other documents from CPHTC which explicitly consider severity on a 1 to 10 scale with 10 being the most severe, <u>see</u> R. at 396–401, as well as common sense suggest that a "2" likely holds the meaning that ALJ Thomas ascribed to it.

However, the probative value of the severity level of "2" is nevertheless questionable.  Because it appears at the top of twelve consecutive examination records

16

as part of a header section in which the same information is consistently repeated verbatim, it is at least reasonable to interpret that data as a field that is automatically populated based on an initial visit rather than information that was updated on each of the relevant dates.[2]  The header first appears on October 27, 2011, and is repeated in treatment notes for twelve consecutive visits.  See R. at 403 (notes of October 27, 2011); R. at 406 (notes of January 27, 2012); R. at 409 (notes of April 17, 2012); R. at 412 (notes of July 18, 2012); R. at 415 (notes of October, 16, 2012); R. at 418 (notes of January 15, 2013); R. at 421 (notes of April 10, 2013); R. at 425 (notes of July 10, 2013); R. at 429 (notes of October 8, 2013); R. at 433 (notes of November 5, 2013); R. at 437 (notes of January 7, 2014); R. at 441 (notes of March 4, 2014).  In contrast, prior to the first appearance of this header information on October 27, 2011, treatment notes from CHPTC reflect variations in Blackert's responses.  On February 8, 2011, she rated her pain as "4–5" out of 10, R. at 396, while on March 31, 2011, and June 3, 2011, she rated her pain as a 3 out of 10, R. at 398, 400, and on June 29, 2011, she reported that her pain was a 2 out of 10, R. at 401.  In sum, viewing the severity score of "2" in the context of the medical records as a whole, it is likely that that number reflected Blackert's report on one visit, as opposed to a contemporaneous recording of her pain rating on each successive visit.  This rather tedious parsing of the record shows that lay interpretation of treatment notes is a poor substitute for physician opinion evidence.

---

[2] In full, the header section states: "Chief Complaint: migraine headache and headache; Location: frontal (left) and nuchal (left); Extension: cervical area (left) and trapezius (left); Quality: aching and crushing; Associated Symptoms: swelling, photosensitivity, nausea and vomiting during headache; Alleviated: medication, rest and dark room; Exacerbated: bright lights, loud noise, chewing and stress; Severity: 2."  R. at 403, 406, 409, 412, 415, 418, 421, 425, 429, 433, 437, 441.  See, e.g., R. at 429 (containing both the severity level of "2" as well as Dates of Service notes from October 8, 2013, indicating that Blackert's "[p]ain levels have been somewhat exacerbated . . .").

The court further cautions that treatment notes which state that a patient's condition is "stable," on their own, are not probative of a patient's disability status.  In his ruling, ALJ Thomas repeatedly notes that Blackert's treatment providers repeatedly describe her condition as "stable."  R. at 80.  Blackert argues that ALJ Thomas "seemed to draw from this evidence that [Blackert] was benefited by treatment."  Pl.'s Mem. at 12 (quoting Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1029–30 (E.D. Wisc. 2004)).  On the other hand, ALJ Thomas cites the stability of Blackert's condition in the context of other treatment notes suggesting that Blackert was responding well to medication, as well as actively looking for work.  R. at 80.  It is therefore not clear whether ALJ Thomas viewed "stable" as a neutral term that connoted something positive only in the context of other indications that medications were effective in controlling Blackert's pain, or whether he interpreted that term to independently connote that she was doing well. While the first use of the word would be reasonable, a neutral term like "stable" cannot, on its own, support a finding of no severe impairment.  As another court in this district has recently stated:

> [A] physician's notation that upon examination a patient's condition is 'stable' means that at that time the condition is neither worsening nor improving; it has been stabilized.  This says little if anything about the severity of the patient's symptoms, and nothing at all about whether the symptoms or effect of the condition render the patient disabled.

Thornton v. Acting Comm'r Soc. Sec., No. 3:13-cv-1558(CSH), 2016 WL 525994, at *9 (D. Conn. Feb. 9, 2016).  If ALJ Thomas interpreted stability as an inherently positive state, he should reconsider that assessment on remand.

### C.    Application of the Treating Physician Rule

Blackert argues that ALJ Thomas's analysis fails to give appropriate weight to the opinions of three treating clinicians, Susan York, Licensed Marital and Family Therapist,

Courtney Howard, Certified Physician's Assistant, and Jane Regan, Registered Nurse. Pl.'s Mem. at 15–20.  Although Blackert concedes that none of these practitioners is an "acceptable medical source" for the purposes of <u>diagnosing</u> an impairment, she argues that ALJ Thomas erred in failing to give sufficient weight to these practitioners' opinions about the <u>severity</u> of impairments that were diagnosed by physicians.  <u>Id.</u> at 16–17.  The Commissioner contends that, although ALJ Thomas accurately noted that none of these practitioners were an "acceptable medical source," he "continued to assess and weigh these opinions by considering the factors listed at 20 C.F.R. §§ 404.1527(c) and 416.27(c)."  Def.'s Mem. at 9;  <u>see</u> R. at 86–87 (analysis of Susan York's medical source statement); R. at 87 (analysis of Courtney Howard's report); R. at 88 (analysis of Jane Regan's report).  While the court may not have reached the same conclusion that ALJ Thomas did with regard to the opinion evidence offered by Howard, York, and Regan, the court agrees with the Commissioner that ALJ Thomas supplied sufficient reasons for weighing their evidence as he did.

However, ALJ Thomas's decisions to discount the opinions of York, Howard, and Regan were each based in part on what he determined were tensions between their opinions and the record as a whole.  <u>See</u> R. at 87 (concluding that Susan York's "opinion of 'marked' limitations in getting along with others, traveling independently, dealing with changes in a work setting, etc. are without any objective support in the record"); R. at 87–88 (finding "no objective findings on repeated physical exams to support" Courtney Howard's opinion that Blackert "cannot perform even sedentary-level work"); R. at 88 (concluding that Jane Regan's opinion that Blackert "has 'marked' limitations in virtually every area of work-related social and cognitive functioning" is "at

odds with the objective treatment evidence"). Because the medical record influenced ALJ Thomas's conclusions for each of these three practitioners, when the record is further developed on remand, ALJ Thomas's analysis may change. It would therefore be appropriate for ALJ Thomas to revisit his conclusions with regard to the opinions of York, Howard, and Regan in light of the full record including opinion evidence from one or more treating physicians.

D.   Vocational Analysis

During the hearing, a vocational expert testified to the availability of work according to various levels of exertion. R. at 143–45. Specifically, ALJ Thomas posed the following hypothetical question to the vocational expert: "[A]ssume an individual of the claimant's age, education, and past relevant work experience who is limited to performing the medium work as defined in the Regulations and has a further restrictions [sic] of the need for only occasional bending, occasional balancing, twisting, squatting, climbing, crawling, and kneeling. And secondly, is limited to simple, repetitious, routine work." R. at 144. Based on this hypothetical, the vocational expert concluded that Blackert could perform the work of a janitor, a hand packer, or a laundry worker. R. at 144–45. ALJ Thomas subsequently adopted the vocational expert's opinion in his ruling and concluded that "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." R. at 90–91.

Blackert argues that ALJ Thomas's vocational analysis was defective, not because ALJ Thomas's reliance on the vocational expert was incorrect, but because the premise for his conclusion—namely that Blackert could do medium work—was not supported by substantial evidence. Pl.'s Mem. at 21–22.

As analyzed in some detail above, the court agrees that the record is thin, to say the least, with regard to Blackert's physical exertional capacity.  The court therefore agrees with Blackert that ALJ Thomas lacked sufficient evidence to conclude that Blackert was capable of medium work and therefore erred in concluding that Blackert could perform the work recommended by the vocational expert.  On remand, the court recommends that, in his development of the record, ALJ Thomas be mindful that the record contains very little evidence as to Blackert's physical exertional capacity.

**V.     CONCLUSION**

For the foregoing reasons, Blackert's Motion to Reverse the Decision of the Commissioner (Doc. No. 19) is **GRANTED** and the Commissioner's Motion for Judgment on the Pleadings (Doc. No. 23) is **DENIED**.  The case is remanded to the Social Security Administration for further proceedings consistent with this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut this 25th day of July, 2017.


                                        /s/ Janet C. Hall_____
                                        Janet C. Hall
                                        United States District Judge